Taylor Rose Rodgers, Ruben Espinoza, and Christian Carranza. Why don't you wait until they get settled, Mr. Giles, looks like, looks like you waited long enough. Go ahead. Please go ahead. Thank you. May it please the court, counsel, I'm Norman Giles, I represent City of Santa Fe Police Officer Christian Carranza. In this case, I'm going to be sharing my time with co-counsel today. If Officer Carranza made any error, it was an error that a reasonable officer could have made under the circumstances he encountered. The Supreme Court has made clear that in Pearson v. Callahan, that the protection of immunity applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mixed statement of law and fact. In Saucy v. Katz, the Supreme Court, after speaking about the objective reasonable standard and noting that the officers could have some leeway in making mistakes under the objective reasonable standard, the court went further and explained that immunity has a further dimension that recognizes that officers can make reasonable mistakes and such mistakes result in the officer having immunity. Officers have to be reasonable, but that doesn't mean they have to be perfect. In this case, what we have is we have a situation where Officer Carranza, neither Officer Carranza nor Ms. Rogers were aware that there were ants in the grass where Ms. Rogers was laying. As soon as Officer Carranza was alerted by Ms. Rogers that there were ants in the grass, then Officer Carranza and other officers immediately began taking action to try to remove her from the ants. That was a fairly long set of words. It immediately began to take action. It does seem to me from looking at the video, I don't know if it's a fact question or not, but when she started reacting to the ants, it does seem to me getting her off the ground took a while. It did. It took her about 30 seconds to get her off the ground, but within three seconds, they started taking action to verify that there were ants on her, they observed that. Within seven seconds, they started actually trying to move her up, but then she started resisting them again. Resisting or reacting to having stings all over her, regardless. It could have been either one, but the officers still had the obligation to have control of her physically. The officers split that second decision within the length of the night and put her down just for a day. One thing that strikes me about the video also is you have six officers standing around or wherever the number is, you have this one woman who's been taking her child to elementary school unless I've forgotten what level school it is, and these six officers are all called in to corral her in some way and to keep her secure and keep the officers from being injured by her. It just all seems so excessive, not constitutionally violative, I'm not going that far, that's something we'll have to decide. Doesn't it seem awfully excessive and being worried about her beating up the officers if they don't keep her under control when they try to pull her off the ants? Seems excessive. I don't believe it's excessive. I believe there were four officers initially and then another one came earlier. But the officers were only trying to gain control, but the officers were also dealing with the child that was in the vehicle, so the police chief had to go deal with the child that was still in the vehicle. That's entirely supersedes me of how quickly she needed to be removed from the ants. The child in the car was not relevant to the delay in getting her off the ants. No that wasn't, but there weren't six officers standing immediately around, but at the time that she alerted the ants, there were three officers there that were nearby and they started taking action to move her up as soon as they were alerted of the ants. But they didn't do anything right at that point to get the ants off her face either. She's asking for that and somebody says something about does he have any water, but I don't see anything on the video that they actually helped her. Well, after she was raised to her feet, Officer Carranza was no longer in control of her. Another officer took her, but it's very second that Officer Carranza raised Miss Rogers and handed her off to the other officer. The police chief of the school district was the one that said to get water on Miss Carranza's face. But nobody did, not that I could see. Well, I don't know that we have enough video to determine that that's the. Well nobody did right then and there. In other words, she's kind of going back to the patrol car and I don't know what happened after that. The video shuts off, but the video doesn't show anybody helping her once the officer says somebody get some water. Well, I don't know what the video showed. I just know that the police chief told someone to put the water on her to get the ants off and I think Officer Carranza would reasonably rely on that officer who has custody of Miss Rogers at that time to do what the police chief told them to and to wash the ants off her face. So would you say your client, Officer Carranza's role in this ended as soon as the plaintiff was on her feet? When does he separate? I didn't pay close enough attention to the video, I guess, to be able to bring that back to memory. Is he done? Whatever he did or didn't do is over once she stands up? Well yeah, once he hands it off to the other officer and they all raised it at the same  That's what I'm asking. Did he hand her off as soon as she stood up? Yes, Your Honor. Okay. So the other thing I'll say is, there was something, I think it was Officer Carranza who folded her legs and then pushed them forward. It was. Why was that? Because when they started to try to raise her, she's fighting with them again and he in that second made the judgment that he needed to gain control of her again and stop the resistance from her before he raised her. He's still got, he's trying to get her out of the... Wasn't there another officer there with him when that was happening? There was. On her? On top of her? Not on top of her, no. Well they had a hand in her back. Right, they did. There were two officers trying to get her up, but just because she's got the ants on her, the officer still has the main control over her to get her up and that's what's going on. But again, it's happening very quickly at the time that that's happening. Well folding her legs over and pushing them forward doesn't help to get her up, does it? No, it doesn't. All right. I'm sorry, my time is up for now, so I'll have to hand this off unless you have another question before I leave. Thank you, Mr. Giles. Thank you. May it please the court, counsel. My name is Charles Corey Rush and it's my honor to represent Chief of Police Ruben Espinosa from the Santa Fe ISD Police Department. We're here on this interlocutory appeal on two claims which the district court denied summary judgment on ball bite immunity. One of those is a bystander liability claim and then one is the previously abandoned excessive force claim that revived itself on summary judgment response. We are here not because of fact issues but because as a matter of law, qualified immunity should have attached to Chief Espinosa here, especially taking into account that the judge's decision below does not in any way, shape or form analyze clearly established law with regard to conduct that Chief Espinosa is accused of. So turning to the first issue with the excessive force claim, from the pleadings onward, the initial pleadings were shotgun pleading. Defendants did this, defendants did that, defendants, defendants, defendants with no real delineation between what officer was accused of doing what. So in our initial answer, we asked for a rule 7 reply asserting qualified immunity to the excessive force claim and bystander liability claim to the extent that those were the ones pleaded against Chief Espinosa. We then get a rule 7 reply built into the next amended complaint that says Chief Espinosa, it's bystander liability. Officer Carranza, it's excessive force. We then get that confirmed two times over in responses to each party's motions to dismiss. In your motion to dismiss, just remind me, did you make arguments specific to an excessive force claim? Yes, Your Honor. We took the pleadings that were actually attributable to Espinosa, which most importantly, most notably would have been the act of tapping the car, stopping the car from being able to move with the officer's unit. That was the main force that Espinosa was accused of committing. So we did say that's the only allegation that he did anything in this complaint. That's not excessive force. We have qualified immunity here. And that's when we got the response to the motion to dismiss that said that, well, excessive force is against Carranza, bystander liability is against Espinosa. All right. Well, what about when I thought Espinosa was the one who got her out of the car and actually put her on the ground in the first place? So that is what happened, but that is not what the complaint says and that is not what was in issue at the 12B6 stage. At the 12B6 stage, it was Carranza that was accused of putting her on the ground. So you request dismissal of all the claims against Officer Espinosa. Yes, Your Honor. The district court denies it. So the district court presumably denied it as to all claims. Does that necessarily lead to the conclusion that this excessive force claim, whether it's the vehicle or taking her out of the car and putting her on the ground, is abandoned or does it just survive into discovery? So I think it's based ... I mean, this is harder because I think the way that the district court even framed the decision on the motion to dismiss led to the conclusion that the only claims remaining were the excessive force claims against Carranza and bystander liability claim against ... But you follow what I'm saying. This isn't a question where the district court granted something as to this claim, that claim, and then just didn't mention the other. This is a denial as to all claims of a dismissal. More or less. You see what I'm saying? In other words, it's really ambiguous as to whether this claim falls away at that point. Your position is the plaintiff comes in and basically doesn't engage on that at all. So whatever the district court ruled on in denying, it wasn't regarding this. There was no evidence that there was an excessive force claim that was going forward as viable. I think we're talking two sides of the same coin. Ambiguity is the phrase here now in hindsight, right? But at the time, the judge phrased it as, I'm analyzing this claim here and this claim here and that's it. And the judge did dismiss the municipal liability claims against the entities earlier in that same opinion. So it really did read at the time, and still to me to this day, that it was just the only remaining claims left moving on from the 12B6 stage into discovery and then ultimately. In discovery, was excessive force explored against Officer Espinoza? Not really. What do you mean not really? Because there were questions about the car being used, but the fixation on this case is and always has been the ant bikes. That has always been the fixation. There were some allegations of injuries caused or alleged from the actions on the ground with Officer Carranza, not Espinoza. But the fixation has always been on the ant bikes, which was- I'm not sure where in procedural analysis fixation fits in. And it's a fair word. I'm not trying to give you a hard time. But looking at this procedurally, it does seem to me we have to decide. I mean, you're indicating the district judge, you can read the opinion to indicate these three decisions were made and that municipal liability was dismissed, the other two matters that were addressed were the only two things still in this case. Maybe, maybe not. We have to consider that. It does seem to me, though it doesn't show up on the video, that Officer Espinoza, chief, whatever it is, ramming the plaintiff's car is something that could have been grounds for a claim to stop her from moving further into the parking lot, which didn't look very crowded from the angle of the video that was showing up at the time. But are you saying, it's not a huge fixation, but are you saying there's no further analysis argument about the ramming of the vehicle that's alive in this case? There has never been. And that was a point raised in the briefing before this court and in the reply to the summary judgment that even if we say that the excessive force claim was not abandoned, we did assert qualified immunity from it at the very onset of the case. And in the summary judgment response, it was just, look, they didn't attack it, I win. But there was no argument of injury. And what about her being grabbed by Officer Espinoza and being put on the ground? That's not been alleged. That's not been briefed either? That has never been. It was never alleged in the complaint and not briefed. That's what happened? Correct. Okay. But at summary judgment, you come in and move. For summary judgment, do you articulate anything with regard to an excessive force claim against Officer Espinoza? Not until the reply because it was deemed . . . So when you move for summary . . . forgive me, I'm just not . . . I've not read all your pleadings and all the papers and the motions, but I'll just be honest. So when you move for summary judgment, Officer Espinoza says, no bystander liability, I need summary judgment. Correct. I mean, you obviously said more than that. But nothing regarding the vehicle, tap, ramming, whatever you want to call it, or bringing her out of the car and putting her on the ground? That is correct. So nothing besides laying out the facts where we did . . . So nothing in the alternative to the extent that plaintiff still alleges any of this. Did you say anything like that? Not in the opening brief on summary judgment. So she comes in response brief and says, well, this claim is clearly . . . they're not challenging it on summary judgment. I don't know if she said it's a motion for partial summary judgment, but either way, that claim's not at issue. Here's the one that is. And then the district . . . and then you come in on reply and said, oh, wait a minute. To the extent this is an attempt to revive it, it is at issue. But then the district court says, can't raise this in your reply brief, and therefore it's sort of set aside. That is precisely what happened. So again, it's the same ambiguity as with regard to the motion to dismiss, correct? Did the claim come off the table at that point, or did it continue to remain viable? The judge denied summary judgment on the excessive force claim. So it was, I guess, remaining for trial as part of this interlocutory appeal. And with that, Your Honor, my time is up. I thank you very much. Your time is up. Thank you. Please proceed. Of course. Good afternoon, and may it please the court. My name is Alexander Johnson, and I will address both our motion to dismiss for lack of jurisdiction that was carried with the case, as well as the excessive force and bystander liability claims, while Mr. Kallinen will address, kind of clean up, be a cleanup batter, as it were, and also address the obviousness of the use of force at issue here with that last five minutes. So starting first with the motion to dismiss for lack of jurisdiction, the first thing I'll point out with that is that neither appellant addressed jurisdiction at oral argument. Obviously, it was briefed and all that. But that is, of course, a threshold issue. That is something that needs to be addressed before we even get to the merits. And the high-level view of that is that Scott can't be read to destroy Johnson's clear limitations of a court's interlocutory jurisdiction in qualified immunity cases, the limitation just specifically legal issues. And what we've been talking about here have been primarily factual issues, especially with respect to Carranza. I'll get to Espinoza a little bit later. But the court should clarify that, that Scott does not destroy Johnson's limitation in that regard, and align itself with at least seven other circuits that found as much. And our position also is that Mitchell or any other qualified immunity or, excuse me, interlocutory appeal jurisdiction case would include what we would consider a procedural denial of the excessive force claims below as the kind of severable final judgment that could be available for an interlocutory appeal. And of course, the second issue that we'll address is the excessive force and bystander liability claims. Because the video clearly shows, as your honors have addressed with opposing counsel, that Ms. Rogers was handcuffed. There were many officers around her. She was subjected to these pain compliance techniques, these ant bites. Well, what the video clearly shows, and your point about Scott notwithstanding, what Scott undoubtedly says is if the video blatantly contradicts one side's version of events, you go with the video.  And so to some degree, we can't pierce the genuineness of any fact dispute. To what degree? Maybe our cases aren't as clear. But what the video indisputably shows here, and I've watched it many, I've watched kind of every angle that I think we had, she's resisting the entire time. She comes out of the car resisting. She's resisting on the ground. She's literally kicking and screaming. And in that case, it strikes me that it's kind of a stretch that Officer Carranza used excessive force to bring this defendant, I guess you'd say, under control to subdue her. Irrespective of the ants being on the ground and all that sort of thing, but if the video shows that she is resisting the whole time, how do you get around that to show the violation of law on Officer Carranza's part? The primary thing I'd say to that is that I don't think the video clearly shows that at all. What if we conclude that it does show she's resisting the whole time? In our view of Scott, in order to get around the jurisdictional issue, what the court would have to find is that, not that the video indisputably shows it, but that the video blatantly contradicts both the district court's delineation of the factual disputes that are alive, as well as our version of events. And then also go on to find that no reasonable jury could find otherwise. Because that's when you get into the merits, and that's the summary judgment issue of no reasonable jury could find this about the video. And what our position is on the video, and of course, as you did, Your Honor, and I'm sure we all have watched the different videos many times, and there are plenty of points in the video where she's just laying still on the ground. She's not kicking and screaming, as you say, the entire time. And she's saying things like, help me, what's going on? She's expressing confusion of the situation. And with respect to your point about resisting from when she gets out of the car, they open the door, and she's asking what's going on, I didn't do anything wrong, and then they pull her out of the car. But she had done some things wrong. She disobeyed the first officer that interacted with her. She turned left anyway. She went into a faculty parking lot the opposite way. There were kids around. We got one officer running after her. We've got an eyewitness that says she was driving recklessly. I mean, a complete non-officer eyewitness. And so by the time that she gets out of the car, they've had to ram, tap, whatever, collide with an officer's vehicle deliberately to stop her. So I don't know that her protestations that she hasn't done anything wrong or she's confused really matters from a reasonable officer's perspective. So the couple things I'd say on that. And you're not challenging that Officer Espinoza took her to the ground initially? Correct, yeah. So Officer Espinoza did take her to the ground initially. But you're not challenging that as excessive? We did challenge that as excessive. Where? It was in the complaint that Carranza used the force to get her out of the car initially. I'm not talking about Carranza. I'm talking about Espinoza, because he's the one that took her out of the car. Right, he's the one that took her out of the car. So what we challenged was the conduct of taking her out of the car, that the takedown out of the car was excessive. Against Espinoza. It was a generalized complaint, and we... It doesn't identify Officer Espinoza. That's what you mean by generalized. Correct. And what we found out... And in your Rule 7 reply, in your operative complaint, it is very clear, crystalline clear, that what you're pursuing against Espinoza is bystander liability only. That is what the Rule 7 reply says. And then what happened after that is, discovery happens, the video is exchanged, and then it is indisputed at that point. But, well, a lot happened after, a lot happened from complaint to discovery. There's a motion to dismiss. Right. You don't come in and argue any sort of excessive force liability against Officer Espinoza. But as you were discussing with opposing counsel, it's ambiguous. There is this kind of denial of the motions to dismiss apart from... But it's ambiguous because the plaintiff's not making the argument at all. In other words, the district court can't rule on anything you're not presenting to the district court. And if you're not alleging it against the defendant, it's really hard for the defendant to come in and say, hey, this claim they're not alleging ought to be dismissed also. So all of the excessive force claims, including the ones that were misidentified against Ferranza, survived the motion to dismiss claim. And then discovery happens, and the identification is correct. So the claim itself of excessive force for removal from the vehicle never goes away. That claim is never dismissed. And then... Against Espinoza? As a general matter. Was it ever pled against Espinoza? Again, not specifically, but that was before we had the video. But it was pled against Officer Carranza? It was... I would have to review the pleadings with a finer tooth comb to speak with 100% confidence. But my recollection to you right now is that the pleadings were a generalized statement that excessive force was used against her and that the removal from the vehicle was part of the excessive use of force. And that at no point was... There's no argument that that was dismissed at some point, and now it's trying to be resurrected. The argument is that it was misidentified at some point against Carranza, and then we get the video, and it becomes undisputed. Nobody has... Since the video has been distributed, there's been no question that Espinoza was the one who did that. So, turning back to the jurisdictional issue, that's... Before you leave that, I guess I'm not sure what you're arguing. 1983 claims have to be made specifically, and they have to be made against specific people. You can't just say defendants did this. So at some stage in the litigation, you have to identify this claim posted, this defendant. What you just indicated is not that the pleadings changed. Or your Rule 7 reply or anything else. It's just that it became known that it was Officer Espinoza. But was ever a claim actually made, as opposed to just floating in everybody's knowledge that this is now the right person? Is there anything in the record on the docket of the district court that is a claim against Officer Espinoza for excessive force? Your Honor, I don't have a clear answer. I don't have an ROA site to give you on that. Well, you don't need an ROA site, but I understand. There's a lot in this case. There's a lot I don't remember about it, but I've lived with it as long as you have. Right. But as far as you know, there would be no plea. Not a plea. Maybe it's in a brief somewhere, in a memo. But there's no pleading that makes this allegation against Officer Espinoza.  I do not believe that there was a plea. Because our firm took over this case after it was originally filed. And some of this initial stuff that happened, including the Rule 7 reply, before we took over as counsel. So some of that is not decisions that we specifically made, so we don't have that specific reason. Go ahead. But ultimately, we pointed out that it was still alive in the summary judgment. Yeah, but if that's where you raise it for the first time, it's not properly before the court. And that's—so I would argue that that was not the first time we raised it because— Well, but you just told Judge Southwick you can't point to a place in the record that raised it before the summary judgment. I said that we couldn't point to a pleading about that. Because we couldn't plead to that before discovery.  And we didn't amend the pleadings after discovery. Okay, but pleadings are how claims are raised. And if you raise a claim for the first time, clearly, in a summary judgment response, the law is very clear. It's not properly before the court. So our—what our argument would be before the district court is that—and this is where—let me amend what I was starting to say. And this is where the jurisdictional issue is really crystallized. And that's because this is not the kind of separable, final—what the district court said about that claim was that this is not raised on summary judgment. But it's a matter of law if the district court incorrectly considered a claim that wasn't alleged. But that's—that's exactly what I'm getting at, is that the district court didn't consider the claim. They just said, I'm setting this aside for now. There's not a substantive ruling on this claim. So where the jurisdiction comes from at this point to then review a claim that was—that the district court hasn't taken first pass on yet is where our concern is. In addition to the substantive—the underlying substantive claims about Officer Carranza's excessive force, not only the ants, which was a focus, but the other focus of this case that's referred to throughout the briefing is Officer Carranza's use of pain compliance techniques throughout. And that's where the only thing in the video that indicates—or the only thing that indicates that Ms. Rogers' motions that you see in the video is anything other than a response to pain is Carranza's own self-serving statements that he believes she was resisting at the time. And she has deposition testimony that counters that. And the videos themselves do not show specific motions that are—that are resistant. She gets pulled out of the car. She's put on the ground. The cuffs go on fairly easily, all things considered. You know, they're holding her. She's not trying to pull her arms away, nothing like that. And at no point is she trying to get up, get away from the officers, anything like this. So the best that Officer Carranza can point to is this kind of generalized notion of flailing. But even then we turn to, again, if we're getting to the merits, the factor analysis of use of force. We point to six factors that we believe Joseph versus Bartlett identifies. Graham has three, however you want to enumerate it. But I think the most charismatic one, given the amount of time remaining, is the idea that there was any kind of immediate safety threat. As we've discussed here thoroughly, there were numerous officers around her. She was confused, basically begging for clarity. She needed a conversation to be treated like a wild animal that was somehow unpredictable or dangerous in any way because she simply wasn't. They took her shoes off. She was barefoot lying in this pile of ants and subject to these plain compliance techniques. And in response to saying, this hurts, stop, she has more pain piled on top of it and is told, simply calm down through the pain. Well, he said, I'll stop when you stop. Right. And that's what Officer Carranza, who had turned on his body cam, was aware that he was being reported, said. But when he says it, and the video at the time, I looked at that pretty closely this morning. When he says, I'll stop when you stop, there's no discernible movements that she's really doing that indicates that she's doing something that he's trying to stop her from doing. And my friend on the other side, Officer Carranza's counsel mentioned something about trying to get up, but then she resisted. They had to put her back down. Again, at that point in the video, there is no clear motions. There's no clear anything in the video other than Carranza's later testimony that she was required to be put back on the ground in order to somehow get her under control when she was in the hands of multiple officers at that point. So with that, I will leave it to my co-counsel. Thank you, Your Honors. The clean-up hitter, you called him. That's right. Bring in the big guns. Thank you, Your Honors. May it please the court. This is a picture of the client. And here is one of the pictures of her and all of her ant bites. That's on the front of her face. Here is on the side of the face. Here is on her wrists. Here is on her back. There are other ant bites throughout her body, and I'm not going to show you those because they're kind of risqué. So when you count them all up, you can easily see that with all the bites, there's over a thousand ant bites. Doing some literature search on fire ants, fire ants are highly dangerous, aggressive pests known to cause severe pain, allergic reactions, and in rare cases, death. Also, fire ants are not invisible. You can see fire ants. You can't always see fire ants. I'm sorry. There are many times I go out to work in my yard and they're all over my feet before I ever see a bed or anything else. They get in pine straw, they're in grass, they're all sorts of places. There's no evidence that the officers put her down in an ant bed deliberately. Well, I believe that is incorrect because you can see fire ants, especially this great number of fire ants. As I showed you, the ants are on the back of her head. Now remember that Carranza, and I'll do this demonstration. Carranza is down here. She's this close. Counsel, you need to stay at the microphone. You can visualize for us with your words. So Carranza is very, very close to them. Probably about this distance right here. You can't see her hand covered in fire ants. I believe you can. Myself, anecdotally, Your Honor, of course, being in Texas here for decades and decades and decades, I've stepped in fire ants and had a lot less than 1,000 bites, maybe 50 or 100, and it was painful. This is not a low-level amount of force. It's not even a medium-level amount of force. This is a high-level amount of force. But how is this force attributable to the officers if they put her in an area with ants inadvertently? Well, it's not inadvertent, Your Honor, because— You're saying they deliberately chose this patch of grass because there were ants there and they wanted to get ants all over her. When she's down there, the ants react. They get on her face. They get on her back. You're not answering my question. The officers can't be attributed to every fire ant bite unless they intended to do it or, like, poured them on her or something. They didn't do that. Well, I agree that not every fire ant bite, but from the evidence that we presented, it's over 1,000 bites, and that's hundreds and hundreds of ants. It's a clear day to assume that the officers cannot see fire ants. That's actually, in my mind, and I think the jurors' mind, kind of a stretch. As a matter of fact, if we would have presented this evidence to a jury, they probably would have said, of course you can see fire ants. And so at the instance you went down, maybe you don't see them. But she's also saying the words ants, and then once she's up, she's saying, brush these ants off my face. So they're biting her face. They never brush the ants off her face. Counsel, you're going to connect this to some law. Yeah, yeah. Well, it's obvious, Your Honor. It's the obviousness point. This is not a novel situation. And under the Cooper case as well as Cooper v. Brown and Newman v. Guidry, this meets the criteria for obviousness, which you can fit into the Graham factors. You don't need a specific case about fire ants. If you did, then you could stick people's face into acid, because I've never had an acid case where a person's face was stuck into acid. I've never had a case where a person was burned by the police officers. Because these are obvious cases. And fire ants, which can cause death, especially with this great number of them, when a jury can easily believe that Carranza and Espinoza can see them, because it's a bright, sunny day, and she's saying there's ants, and they're staring right at her by the video. This is an obvious case. It meets the criteria for an obvious case. Why isn't this a case, as far as the video and Scott v. Harris is concerned, that they were unaware and there's nothing to support? They were aware of the ants until she, at some stage, halfway through, more than halfway through, mentioned the ants. They may have been slow in reacting, and I sure would not want to be in her position. But it seems to me quite soon after she mentioned the ants, they started to give her up, and then we get into the whole debate about how much she was resisting. I think if I was being bitten all over the place, I'd look like I was resisting, and whether she actually was or not is a different matter. But didn't it play out that way, that the ants became an issue after some period of time, and within a few seconds, they started the effort to stand her up? Isn't that the undisputable evidence? No, Your Honor. I think if you look at the video, she talks about ants, and why would a person lie about ants? So once they said ants, that should have instantly said, oh, get up. But didn't they fairly quickly, after she mentioned ants, start to get her up? Not in her opinion, and I don't think in the jury's opinion. We have the video. We can hear when ants are first mentioned, and it does seem to me I would have to look at it a few more times. But Scott B. Harris requires us to do that fairly soon after ants are mentioned. They are working to get her up. Now, maybe they didn't do it well enough, and maybe there's some issue there. But give us the straight facts here. Isn't that what it shows? Well, I think the time is still too much time. These are fire ants, and she's a small woman, and there's six officers around her all the time. How much time elapsed between her first mentioning that she was being bitten by ants and the time that you agreed they were trying to get her up? I'm sure it's debatable when they were making an effort to get her up. But you'll agree that at some point they made an effort to get her up. So how much time elapsed, according to you, between the time she complained of ants and the time that they made a move to get her up? How much time elapsed? Gosh, it's in the video, so it's there. So my opinion of it is – I mean, my statement would be – I wouldn't know exactly. I think the defendants say it was three seconds when they started the effort. Are you saying that's way out of line? Well, when the concept of started an effort, they didn't get her up. As a matter of fact, they kept her down. And then when she said there's ants and they're still all there, once again, you can see – a person who was looking at a person can see the ants on her face. They still didn't get her off her face because, if you recall, the Honorable Judge Brown says that leaving the ants on the face was also excessive force. Let me ask you this. Judge Wilson asked one of the other counsel. What happened after she got a – that's in the record about the ants being – somebody working to get the ants off her face? She asked several times. It's in the record where she said get these ants off. Once she stood up – I'm talking about when it starts. Once she's up, did somebody fairly quickly pour water on her face? Did nothing happen?  Nobody brushed off ants. Nobody poured water on her face. Okay. Thank you, counsel. We have your argument. Thank you, Your Honor. I'm not aware of anything in the record that proves that she didn't get the things washed off immediately. Or anything that says it did happen, correct? I don't have anything that says it did happen either, no. So there's nothing in the record about what happened? No, Your Honor. I must start with the jurisdiction since they raised jurisdiction. Of course, the court has jurisdiction to decide legal issues. The court has jurisdiction to do a de novo review of the recordings. The court has jurisdiction to identify what the facts are that are material to resolution of the case. But we don't have jurisdiction to assess summary judgment on a claim that wasn't ruled on by the district court. I believe as to my client, the judge ruled on all the claims. As to the other question, I'm not sure that I can identify a basis for that jurisdiction. I think you're speaking about as to the claim of excessive force against the police chief. Espinosa. Yes. I can't identify a basis for jurisdiction. So you agree that we can't really reach that claim, that claim still sitting in the district court? If the court finds that that claim was a real claim, was actually in the district court. Well, the problem we've got, I guess, is the district court did, right? Yes. The district court sort of set it aside. It's not an issue in the summary judgment papers. So didn't rule on it. And so the argument, it may be that the answer is the argument that whether it's forfeited, not forfeited, sustained, alleged, whatever the status of it is, is really something for the district court to contend with, not to address here on appeal. I'm afraid I have to agree with you on that. Even if Espinosa's counsel might not agree with you. He may not. Hopefully you'll give him five minutes or two minutes to deal with that. But I can't give you the basis for it as best I can do with it. And may I go on to the other part of the immunity issue is the plaintiffs have the obligation, Mr. Rogers has the obligation to identify some legal authority that would have informed Officer Carranza and the police chief that what they were doing violated clearly established law. There's no identifiable case where an officer used the level of force that Officer Carranza used. And he's been found to have violated the Fourth Amendment. I'm not even sure if we can call the ant bites in this context to be a use of force. It seems to me, again, to be that maybe it's a mistake, but I'm not sure it's a use of force. But wouldn't the use of force being continuing to hold her down despite, let's say no effort was made to lift her up and just allow the ants to keep biting her, which to some extent I would imagine she felt somewhat happened. Surely that's excessive force to allow that kind of continuing injury even if it's been inflicted by insects. I would agree with you. So the question then becomes did the way they reacted to that, was that the shorter term equivalence of the same thing? I agree with you. If they held her down deliberately there knowing there were ants there and it was for the purpose of detaining her, then that would be improper. The question here becomes how quickly must the officer act to remove her from the ant bites from the time that he found out? And here we're talking about a very quick term, period of time. And there's no, certainly there's no authority that would inform the officer as to, you know, they could no longer, for example, control her resistance while he's trying to remove her up from the ants. There's just no guidance in the law that would have clearly established what the officer had to do. It's kind of like what you came up in the last case with what is the officer supposed to do that he didn't do and then how did he know that that's what he had to do? And so I think that there's no basis for showing that there's any violation of clearly established law. The two cases that- Well, I think when you're talking about ants biting her, what you do is you move her immediately. And if your defense to the not, so you know what you need to do. You need to get her immediately out of the ants. Your defense to not doing it, I guess, is, well, she was still resisting. I'm sorry, I didn't hear that. Your defense in not doing it immediately. You'll agree with me that if someone has covered an ant, you can remove them immediately. I agree, absolutely. All right. And so if you don't do it, then there needs to be a reason you don't do it immediately. And what you're saying is it was because she was still resisting. That's absolutely correct. All right. And I'll mention briefly- You don't have any time to mention one more thing. Thank you, though. We have your argument. Thank you. Thanks to all counsel here for assisting us with this case. We are in recess until tomorrow at 1 p.m. All rise.